# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

| | |
|---|---|
| ACCO BRANDS USA, LLC<br>f/k/a ACCO BRANDS, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>NOBLE SECURITY INC., ET AL.,<br><br>       Defendants. | Civil Action Nos.: 03 CV 1820;<br>06-07102, 07-00591<br><br><br><br>Judge Zagel<br>Magistrate Judge Keys |

## MEMORANDUM IN SUPPORT OF NSI'S MOTION FOR SUMMARY JUDGEMENT OF UNENFORCABILITY FOR INEQUITABLE CONDUCT OF THE PATENTS IN SUIT AND/OR FOR PARTIAL FINDINGS OF FACT

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II. APPLICABLE LAW ...............................................................................................4

    1.  Standards for summary judgment................................................................4

    2.  Standards for determining "materiality"......................................................4

    3.  The relevance of CIP applications and their patent claims ..........................4

    4.  Doctrine of "infectious" unenforceability ...................................................5

    5.  Inventorship affects patentability under 35 U.S.C. §§102(e) and 102(f) .........................5

III. STATEMENTS OF FACT AND THEIR LEGAL RELEVANCE..........................6

    1.  ACCO's computer security patent family ...................................................6

    2.  The Mac Portable 3 x 8 mm security slot was material prior art.................6

        A.  The Mac Portable security slot existed in 1990 and had the 3 x 8 mm slot..............6

        B.  Kensington knew the dimensions of the Mac Portable security slot ........................8

        C.  The Mac Portable security slot was "material," not "cumulative" prior art..............9

        D.  The Mac Portable Mac Portable prior art was not properly disclosed .....................11

    3.  The April 1992 sale of the MicroSaver lock was material prior art
       to all of ACCO's CIP   patent applications ...................................................11

        A.  The CIP status of the patent applications establishes the
           reference "invention dates" for prior art disclosures...............................11

        B.  The MicroSaver lock was on sale at least as early as April 1992 .............................12

        C.  ACCO did not properly disclose the prior MicroSaver lock sales...........................12

           i.  The '634 Patent Application proceedings .........................................................12

           ii.  The '989 Patent Application proceedings ........................................................13

           iii.  The '403 Patent Application proceedings.......................................................14

           iv.   The '479 Patent Application proceedings ........................................................14

           v.    The '125 Patent Application proceedings ........................................................14

     D.   The prosecution histories establish the materiality of the
         MicroSaver lock sales in April 1992.......................................................15

4.   The PCT '295 document was material prior art ...........................................16

5.   ACCO failed to disclose material admissions and inconsistent prior
    litigation statements concerning inventorship ................................................17

     A.   The complex web of interrelated applications made the
        issue of inventorship important ..............................................................17

     B.   The importance of inventorship under 35 U.S.C. §102(e) .......................17

     C.   Prior testimony contradicts material statements made in the Patent Office.............18

6.   ACCO breached its duty to disclose litigation information ...........................19

7.   Intent is easily inferred here from ACCO's overall conduct,
    particularly from the pervasiveness of the failures to disclose
    many items of material information in numerous patent applications............ ...........21

IV. CONCLUSION............................................................................................................21

## I.    INTRODUCTION

Defendants Noble Security, Inc. ("NSI") moves for summary judgment of unenforceability for inequitable conduct, relative to U.S. Patent Nos. 5,502,989 ("'989 patent"), 7,100,403 ("'403 patent"), 7,111,479 ("'479 patent"), and 7,121,125 ("'125 patent"), asserted by Plaintiff ("ACCO" or "Kensington"). SUF,[1] ¶1. To avoid redundancy, NSI incorporates by reference, pursuant to Fed.R.Civ.P. Rule 10, the entire submission of docket Nos. 256 through 268 and 273 through 283, comprising a similar Motion submitted by PC Guardian ("PCG").

In this Motion, NSI: (a) cites additional elements of inequitable conduct -- other than those raised by PCG; (b) extends the Motion for inequitable conduct to the '989 and '479 patents (asserted against NSI, but not against PCG); and (c) elaborates some of the arguments that were previously made by PCG, as summarized below.

The undisclosed "material" information includes:

a.    Sales of ACCO's MicroSaver lock, beginning April 20, 1992;
b.    The publication, in Europe, on August 5, 1993, of the (then still secret) contents of ACCO's first U.S. application;
c.    Inconsistent ACCO testimony regarding the issue of "inventorship";
d.    The 3.3 x 8.3 mm security slot size in the Mac Portable; and
e.    General information identifying related litigation.

First, the four patents in suit were all granted on respective CIP (Continuation-in-Part) patent applications. The effective "CIP dates" of these patents is not earlier than October 15, 1993. The importance of that date can not be overstated, since it is black letter law under 37 CFR 1.56(e) that:

> In any continuation-in-part [CIP] application, the duty under this action includes the duty to disclose...information...which became available between the filing date of the prior application and the...date of the continuation-in-part application."

Therefore, the CIP "date" of the '989, '479 and '125 patents mandated disclosure of all material prior art dated earlier than October 15, 1993, rather than only prior to the January 24, 1992, filing date of ACCO's original, parent application number 07/824,964 ("the '964 Application"). The CIP date for the '403 patent is even later, June 7, 1995. Yet, ACCO failed to disclose that its commercial product, the MicroSaver lock, was placed on sale as early as April 20, 1992, more than a year prior to October 1993, which made the sales crucially important, material prior art under 35 USC §§102(b)/103.

---

[1]   "SUF" refers to the annexed NSI Rule 56.1 Statement of Undisputed Facts.
{00980986.1}                                                    1

Secondly, U.S. patent application number 08/138,634 ("the'634 Application") is the first CIP application, filed on October 15, 1993. Each of the '989, '479, and '125 patents directly emanates from the '634 Application, and a finding of inequitable conduct in that the '634 Application also "infectively" renders those later patents unenforceable. Therefore, all prior art earlier than October 1993 had to be disclosed in the '634 Application, as well. ACCO did not disclose the April 1992 sales of the MicroSaver lock at all. ACCO also did not disclose the publication in Europe, on August 5, 1993, of the WO 93/15295 document ("the PCT '295 document"), which published the entire contents of ACCO's original '964 Application.

Failing to disclose one's own prior sales, occurring more than one year prior to the patent application date, is a fundamental and egregious breach of the duty of disclosure. In patent practice, concealing one's own prior sales, particularly those commenced more than a year prior to later-filed CIP applications, cannot occur inadvertently or unintentionally.

Thirdly, the issue of inventorship arose during the prosecutions of ACCO's interrelated web of patent applications. Pre-2005 depositions and trial testimony transcripts contain the sworn testimony of inventors Carl and Zarnowitz that they cannot identify anything contributed by inventor Murray. They were wondering what caused the patent attorneys to add Murray's name to the '634 Application, filed October 15, 1993. Six prior, related ACCO patent applications on the same subject matter, filed prior to October 15, 1993, do not name Murray as an inventor. Murray himself testified that Carl and Zarnowitz alone invented the "rectangular" shape of the security slot, and the T-bar and "pin structure" of the lock. Murray did not invent the 3 x 7 mm slot size. In the Belkin trial, Murray testified that the customer "contributed" (i.e., chose) the final 3 x 7 mm slot dimension.

None of that conflicting and inconsistent inventorship-related testimony was ever disclosed in the Patent Office proceedings. The "customer" (i.e., the customer's employee) who actually chose the 3 x 7 mm slot dimension may very well be an inventor on all the patents in suit, since they all contain claims directed to that 3 x 7 mm slot dimension. If so, the application of prior art under 35 USC 102(e) and the patentability analysis in the Patent Office would have been drastically altered. But the information and testimony about inconsistent and conflicting claims of inventorship was never disclosed.

Fourth, the (about) 3 x 8 mm slot in the Mac Portable undoubtedly existed in 1989. ACCO knew of slot and its dimensions, having designed, made and sold a security kit for it in 1990 using that slot dimension, and artfully concealed that slot dimension from patent Examiners

{00980986.1}                                    2

in multiple subsequent patent applications. The concealed information was unquestionably material. The failure to disclose it renders unenforceable not only the '403 and '125 patents, but the '989 and '479 patents as well.

Lastly, patent practitioners must know the dictates of 37 CFR §1.56 and the related MPEP provisions ("Manual of Patent Examining Procedures"). MPEP §2001.06 (Rev. 2 May 2004) requires disclosure of related litigations, particularly a patent applicant's prior inconsistent deposition and trial testimony on subjects such as inventorship and prior art, assertions of inequitable conduct, etc. Yet, despite prosecuting more than 25 interrelated patent applications and coordinating its patent procurement program with dozens of patent suits and threats of suits, ACCO only disclosed one irrelevant Federal Circuit decision on the subject of "infringement" by PCG of the '989 patent. ACCO's disclosure was selective, limited, and always late. It reflects an intent to conceal, not inform.

In summary, ACCO did not properly disclose the Mac Portable 3 x 8 mm security slot; nor the existence of, and contentions in, myriads of related-litigations; nor its prior sales in April 1992; nor the publication of the original patent application in August 1993 in Europe; nor the conflicting sworn testimony concerning inventorship; nor a litigation-related claim by a third party (ByteBrothers) that its owner Darrell Igelmund invented the subject matter of the '989 patent prior to ACCO. There was no single, inadvertent failure to disclose. The failures to disclose were systematic, interspersed throughout many patent applications, and clearly calculated to secure allowances of dubious patent claims, through no disclosure or partial disclosure or artfully disclosed (yet concealed) information. Indeed, from the technological perspective, William Murray's assertion that the specific "about 3 x 7 mm" size of the "Kensington security slot" caused the sales of the MicroSaver lock to increase substantially, is more than incorrect. It is dishonest – indeed ludicrous.

This Motion has been deliberately prepared without reliance on any opinion or evaluation of any expert or pundit on the instant subject matter. Simply put, the open and public record of the United States Patent Office on the involved patents and their interrelated patent applications fully reveals what ACCO disclosed or did not disclose during the course of prosecuting more than 25 applications over eighteen years. The Patent Office's records, in and of themselves, allow the Court to determine whether information that was not disclosed was material to the examinations of the various patent claims in this lawsuit, which the Court has already reviewed

during the *Markman* claim interpretation process, and via other Court proceedings. The decision of materiality can be easily made as a matter of law.

So too, with respect to the issue of intent, NSI is not relying on, nor basing this Motion on, any assertion that it has probed the minds of various employees or agents or attorneys of ACCO and so determined that they intended to deceive or mislead the Patent Office. Rather, it is contended herein that as a matter of law, the extent, duration, and serious failures to disclose such fundamental information as prior sales, publication of one's own patent in a foreign country, testimony of co-inventors that William Murray contributed nothing to any of the inventions (whether true or not), was of the type and character which requires a finding of "intent" as a matter of law, regardless of what actually transpired in the minds of the ACCO people involved.

## II.    APPLICABLE LAW

### 1.  Standards for summary judgment

The standards for granting summary judgment including under the widely cited *Anderson* case have been stated in companion pleadings and are incorporated by reference herein.

### 2.  Standards for determining "materiality"

The objective standards for determining "materiality" are not to be determined on the basis of a particular patent Examiner, but rather by reference to the "ordinary reasonable Examiner," similar to the mythical "ordinary person" of general jurisprudence. As noted by PCG, documents or information are material if a reasonable Examiner would have considered them pertinent in examining the particular application and/or if they comes within the dictates and jurisprudence developed for 37 C.F.R. §1.56.

### 3.  The relevance of CIP applications and their patent claims

As set forth in 37 C.F.R. §1.56(a), the materiality is determined relative to patent claims. CIP applications introduce or add "new matter" and their patent claims which rely on the "new matter" have "invention dates" which are presumed to coincide with the CIP application's filing date. A CIP application is unlike a patent application which is re-filed as a "continuation" application, to continue prosecuting claims supported by a prior application. A "divisional" application is filed when the Examiner, in a prior application, issues a "restriction" requirement, asking the applicant to separate the claims into different applications (when an application presents claims covering more than one inventive concept). Both continuation and divisional

applications do not add "new matter." Their specifications and drawings must be essentially identical to those of the prior, parent applications.

35 U.S.C. §132 forbids the introduction of new matter into an existing application. If one desires to add new disclosure in the form of different embodiments and variations of what has been previously described, he or she must then either file an entirely new application or a CIP application. A CIP application typically contains both prior and "new" disclosures.

Therefore, CIP applications are unique in that applicants must disclose prior art which has become known during the period between the original patent filing and the date of the CIP application (or applications). Contrary to ACCO's assertions in the Patent Office, there is no *per se* rule that a CIP application is Accorded the priority date of the original parent application to which it asserts priority.

### 4. **Doctrine of "infectious" unenforceability**

The doctrine of infectious unenforceability renders unenforceable patents granted on applications which are descendants or the "children" of a prior-filed "parent" application in which inequitable conduct has been established. A patent that issues from a continuation application may be held unenforceable where (i) there is inequitable conduct with respect to the prosecution of an earlier related application in the chain leading to the challenged patent and (ii) the inequitable conduct relates to the asserted claims of that patent. *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F.Supp.2d 580, 595 (D. Del. 2006), *aff'd* 480 F.3d 1129 (Fed. Cir. 2007). The '989, '479 and '125 patents are continuations or divisions of the same original application – the '634 Application.

Inequitable conduct in the prosecution of a patent application which resulted in a patent cannot be "cured" by subjecting the issued patent tainted by inequitable conduct to a subsequent reexamination in which one attempts to "cure" or purge the prior violation(s) of the duty to disclose. *Golden Valley Microwave Foods, Inc., v. Weaver Popcorn Company, Inc., et al.*, 837 F. Supp. 1444 (N.D. Ind. 1992).

### 5. **Inventorship affects patentability under 35 U.S.C. §§102(e) and 102(f)**

Pursuant to §102(e), if the claimed inventorship in an application and a subsequent CIP application is not identical, meaning that there is no complete identity of the named inventors, then that prior application can be prior art to the subsequent application (save for the exception stated in 35 U.S.C. §103). Similarly, inventorship is always important, in view of the dictates of 35 U.S.C. §102(f) that only an inventor may file for a patent.

{00980986.1}                                     5

III.  **STATEMENTS OF FACT AND THEIR LEGAL RELEVANCE**

1.  **ACCO's computer security patent family**

The patents-in-suit are part of large family of patents which are all directed to a locking device which works with a standardized security slot provided in electronic equipment such as computers, to prevent their theft.

The family includes 20 issued patents, the patent numbers of which, including filing dates and issuing dates are set forth in **Exhibit 20** to the Moskowitz Declaration annexed to NSI's Rule 56.1 Statement of Undisputed Facts. The patent family arose from the prosecution of 25 different patent applications (some ultimately abandoned), the identity of which (including the family chain) is set forth in **Exhibit 19** to the Moskowitz Declaration.

As noted, the first utility patent application is the '964 Application, filed January 24, 1992 (subsequently abandoned). Through continuation practice, it ultimately issued as patent 5,381,685 ("the '685 patent"), **Exhibit 26** to the Moskowitz Declaration. On October 15, 1993, a first CIP application was filed, namely the '634 Application, which eventually matured into U.S. Patent No. 6,000,251 ("the'251 patent"). **Exhibit 18** to the Moskowitz Declaration. Prior to the filing of the first CIP application on October 15, 1993, the family included six patent applications (including two design patent applications), none of which list William Murray as an inventor. Murray first appears as an inventor on the aforementioned '634 CIP application and on all the later filed applications.

All the patent applications and issued patent are directed to the same locking concept based on the idea of providing a "standardized sized slot" in portable electronic equipment such as computers, and providing a lock with the locking element that locks in the slot. **SUF ¶59**. A flexible cable is attached at one end thereof to the lock and includes at the other end thereof a loop through which the cable can be attached to an immovable object. The 20 issued patents describe various embodiments and combinations of elements for implementing the locking mechanism.

2.  **The Mac Portable 3 x 8 mm security slot was material prior art**

A.  The Mac Portable security slot existed in 1990 and had the 3 x 8 mm slot.

The Apple Computer Mac Portable M5120 laptop computer was a relatively short-lived product. It was introduced September 1989 and discontinued, according to one source in February 1991, and according to another source, in October 1991. **SUF ¶3**. Both dates are prior

to the first patent filing (serial number 07/824,964 ("the'964 Application") by ACCO on January 24, 1992. ACCO does not dispute that the Mac Portable was provided with a rectangular security slot (insisting, however, it has a "hole," not a "slot") and that it was marked with a "chain" symbol to indicate its function. **SUF ¶4.** Counsel for PCG purchased four units of the Mac Portable, and NSI's counsel purchased two of them. **SUF ¶5.** When rounded to one decimal point accuracy, the security slots in these Mac Portables measure 3.3 x 8.3 mm. **SUF ¶6.** Also see below.



On January 23, 1989, Apple Computer Inc. filed four design patent applications on the Mac Portable. **SUF ¶5.** All include a Figure 7, showing the security slot. Its length dimension when compared to the standard sized connectors shown to the left of the slot is consistent with a slot size of about 3 x 8 mm. **SUF ¶5.** One of these patents, Des. 313,403, issued on January 1, 1991. It includes Figure 7, via its prosecution history. **SUF ¶5.** These patents are prior art as of January 23, 1989, pursuant to 35 USC §§102(a), 102(b), 102(e) and/or 103.

A PCG Mac Portable expert has seen a very large number of these computers and all consistently feature the same security slot size of approximately 3.3 x 8.3 mm. Given that the reference date for disclosure of prior art by ACCO is the January 24, 1992 filing date of its first patent application, there is not a shred of evidence anywhere to support ACCO's assertion that the slot size in the Mac Portable was larger prior to January 24, 1992, and was shrunk by Apple Computer after that date. The inescapable fact is that the Mac Portable included and was sold with its 3.3 x 8.3 mm security slot since 1989.

### B. Kensington knew the dimensions of the Mac Portable security slot

William Murray admitted being familiar with the Mac Portable as early as 1990. Murray was in charge of engineering and knew of Kensington's "Apple Security Kit" which included a "wire loop," engineered by ACCO to fit in the Mac Portable security slot. **SUF ¶8**. It is logic-defying and sheer folly to assume or to credit ACCO's present assertions that the corporate entity Kensington did not possess engineering drawings or the corporate knowledge that the security slot size in the Mac Portable was about 3.3 x 8.3 mm. ACCO has provided no document or testimony that it redesigned the wire loop for the Mac Portable to accommodate its (purported) "shrunken size" in 1992. **SUF ¶9**.

William Murray, Janet Dulsky and ACCO's present trial counsel (including Messrs. Munson and Smith), were all present in court in May 2004, when ACCO's technical expert, Dr. Dornfeld, was asked by Belkin's counsel Mr. Kurland whether he is aware that the approximate size of the slot in the rear of the Mac Portable computer (he was gazing at) is somewhere "in the range of 3 to 7 millimeter, 3 x 7 centimeters?" Dr. Dornfeld responded: "It looks a little larger, but it's certainly close." **SUF ¶10**.

Dr. Dornfeld certainly was not looking at a 3 x 7 <u>centimeter</u> slot, drawn below to the right. He was looking at the 3.3 x 8.3 <u>millimeter</u> security slot of the Mac Portable, shown below to the left.



Nonetheless, viewing that slot with his naked eye, without a ruler or caliper, or even a reference drawing of an actual 3 x 7 mm slot, he pretty unequivocally knew that the slot he was staring at was "a little larger, but it is certainly close" [to a 3 x 7 mm slot]. His ability to testify

as he did is nearly humanly impossible, without his being previously aware of the exact size of the Mac Portable security slot. None of William Murray, Dr. Dornfeld and Janet Dulsky, are in a position to credibly challenge knowledge by ACCO that the slot size in the Mac Portable was a little larger, but certainly close to 3 x 7 mm. They knew in 2004 that the Mac Portable slot size, rounded to single digit millimeters, was a 3 x 8 mm slot.

### C. The Mac Portable security slot was "material," not "cumulative" prior art

As emphasized by PCG, the specific dimensions of the security slot in the Mac Portable constituted the "material" prior art information. Each of the independent claims in the '403 and '125 patents includes the slot size limitation. **SUF ¶11.** So do independent claim 13 of the '989 patent and independent claim 8 of the '479 patent. **SUF ¶11.**

The "materiality" of that slot size cannot be questioned. In an interview with the Examiner on March 11, 2005 (in the prosecution of the '403 patent), the Examiner wrote: "Mr. Jewik proposed submitting declarations to bolster his argument regarding the patentability of the locking member 3x7 millimeter slot and these will be given further consideration along with any amendments submitted." (emphasis added). **SUF ¶12.** Thereafter, the Murray and Dulsky declarations were submitted, and these were followed by a "Notice of Allowability" in which the Examiner stated: "Applicant's declarations (filed 6/29/05) of commercial success and long felt need are persuasive. Accordingly, it is agreed that there would have been no motivation to provide a 3 mm x 7 mm rectangular slot as claimed in the locking method of the instant invention." (Emphasis added). **SUF ¶13.** Contrary to ACCO, Mr. Jewik did not argue a novel "combination" of known elements. He argued the novelty and patentability of the "3 x 7 millimeter slot." ACCO/Kensington has been proclaiming to the world for years, that it "invented" the "Kensington Security Slot." **SUF ¶14.**

Contrary to ACCO, the 3 x 8 mm security slot in the Mac Portable is not irrelevant because it is formed in "a ledge" in the wall. The ACCO patent claims do not exclude a slot formed in a "ledge" in the wall. It is even more incorrect for ACCO to assert that a 3.3 x 8.3 mm security slot is not "material" prior art because its dimensions are outside the scope of its patent claims. The differences between 3.3 x 8.3 mm and "about 3 x 7 mm" slots are not discernible to the naked eye and are technologically meaningless. It is disconcerting that the Patent Examiner actually accepted ACCO's (dishonest) assertion that the claimed 3 x 7 mm slot dimension is responsible for or has any nexus to the commercial success of the locks. Is ACCO genuinely

asserting now (to avoid a finding of inequitable conduct) that its sales would have been much lower had computer OEMs opted to make the slot size 3.3 x 8.3 mm?

NSI was able to fit and lock to the Mac Portable its (accused) NS-20 and NG-34 locks which contain the same (but slightly stretched) T-bar and pin structures, without impacting any of ACCO's patent claim language. *See* photos below. **SUF ¶15.**

 

ACCO's own MicroSaver lock can be adapted to fit the Mac Portable slot. Further, an assertedly infringing Byte Brothers lock, also fits and locks to the Mac Portable security slot. **SUF ¶16.** See the photo below.



Contrary to ACCO, the Mac Portable security slot would not have been "cumulative" to the Wilson slot. First, ACCO's own T-bar based locks cannot be locked in the <u>circular</u> Wilson hole. Second, the prosecution history shows that the Examiner believed that Wilson does not disclose any slot size.[2] Third, ACCO's patent counsel, Mr. Jewik, argued vehemently against the relevance of the Wilson round hole. He urged that a <u>hole</u> is not a <u>slot</u>. **SUF ¶17**. Thus, there can not be any genuine factual dispute that the Mac Portable security slot was material prior art, not "cumulative" to the Wilson hole before the Examiner. The "materiality" of the Mac Portable 3 x 8 mm slot (provided to prevent theft) has been established beyond cavil.

### D. The Mac Portable Mac Portable prior art was not properly disclosed

The patent Examiner stated that none of the prior art disclosed the dimension 3 x 7 mm security slot. **SUF ¶19**. Another Examiner was not even aware of any security slot in any computer related device and was only aware of "ventilation slots." **SUF ¶19**. Yet, ACCO argues that it disclosed the Apple slots in the introductory pages of its patent. ACCO further urges that by providing photos and literature about its "Apple Security Kit," it disclosed the dimension of the security slot. But none of the submitted materials even showed the Mac Portable security slot, let alone its shape and, most importantly, its dimensions. There is not a shred of evidence in the record that ACCO disclosed to the Patent Examiner the Mac Portable security slot of about 3.3 x 8.3 mm. **SUF ¶20**.

### 3. **The April 1992 sale of the MicroSaver lock was material prior art to all of ACCO's CIP patent applications**

#### A. The CIP status of the patent applications establishes the reference "invention dates" for prior art disclosures

The four patents in suit share the feature that they are all based on CIP (Continuation-in-Part) applications. **SUF ¶21**. Unlike a simple Continuation or Divisional application, a CIP application is a second application which <u>adds new information</u> not contained in the disclosure of the first application. *In re Bauman*, 683 F.2d 405, 408 (CCPA 1982). ACCO's '634 Application was the first CIP application which newly introduced, on October 15, 1993, Figures 14-27 and their accompanying descriptions. This disclosure is not found in the original application filed January 24, 1992.

---

[2] Examiners are under intense departmental (and financial) pressure to meet quarterly "production goals." **SUF ¶18**. The Examiner apparently did not "scrutinize" the Wilson reference, to discern disclosure of <u>any</u> slot size. It is a legal fiction that an Examiner would have had the time to peruse the <u>hundreds</u> of U.S. and foreign patents and articles and other documents dumped on her by ACCO.

The CIP "invention date" for the '989, '479 and '125 patents is October 15, 1993, based on the claim to priority to the '634 Application. **SUF ¶22**. The CIP invention date for the '403 patent is not earlier than June 7, 1995 based on the filing date of application Serial No. 08/485,518 ("'518 Application"). This is because the "new" disclosure in the form of Figures 14-27 and the relevant text was first introduced in the chain of applications on that date. **SUF ¶23**. Indeed, in the '403 patent, the attempt to claim back to January 24, 1992 fails, because the chain of application is broken between the '518 Application and the prior claimed application 08/042,851. This is because the patent (No. 5,381,685) on the '634 Application issued January 17, 1995, prior to the filing date of the '518 Application, on June 7, 1995, violating the "copendency" requirement of 35 U.S.C. §120. **SUF ¶24**.

Claim 3 of the '403 patent recites that the pin is inserted "after" the locking member is moved to the "locked position." **SUF ¶25**. In 2003, ACCO's technical expert Dr. Dornfeld testified that the "after inserted pin" feature was "new matter" relative to the original patent disclosure of January 24, 1992. ACCO disclosed neither Dr. Dornfeld's prior inconsistent testimony, nor the sale of the MicroSaver lock more than three years prior to June 7, 1995. **SUF ¶¶26, 27**.

Since 37 CFR §1.56(e) states that in a CIP application one is obligated to disclose all prior art between the date of the CIP application and the date of the first-filed application, ACCO was obligated to disclose all prior art that came into being between January 24, 1992 and June 7, 1995 (for the '403 patent) and prior to October 15, 1993 (for the '989, '479 and '125 patents).

B. The MicroSaver lock was on sale at least as early as April 1992

A trademark application to register the name MicroSaver shows that ACCO's MicroSaver lock was on sale in interstate commerce since April 20, 1992. **SUF ¶30**. Regardless, it is not in dispute that the MicroSaver lock embodying the lock construction shown in Figures 2 and 11-13B and sized to closely fit a security slot shown in Figures 5, 7 and 9 of its original patent application, was on sale more than one year prior to October 15, 1993. **SUF ¶30**.

C. ACCO did not properly disclose the prior MicroSaver lock sales

i. The '634 Patent Application proceedings

In the six year '634 patent application proceedings (from October 15, 1993 to December 14, 1999), ACCO did not disclose the April 1992 MicroSaver lock sales at all (not even through submission of product packaging discussed later). **SUF ¶31**. The '634 Application covered the embodiment of Fig. 16, admitted by Dr. Dornfeld not to be entitled to the original "invention

date" of January 24,1992. The resulting U.S. Patent No. 6,000,251 contains claims to lock configurations which are not disclosed in the original parent patent application. **SUF ¶31**. It is beyond question that the '634 patent application required disclosure of all prior art "published" prior to October 15, 1993. The failure to disclose the MicroSaver lock sale in the '634 patent application gives rise to inequitable conduct in that application, and that inequitable conduct, therefore, "infects" the '989, '479 and '125 patents which are "anchored" in the '634 patent application.

      ii.   The '989 Patent Application proceedings

The '989 patent resulted from a divisional application of the '634 patent application. It is similarly directed to patent claims defining inventions based on "new matter," that are not described or supported in the original January 24, 1992, patent application. **SUF ¶34**. Yet, the '989 patent was prosecuted from September 16, 1994 to April 2, 1996, without the crucial April 1992 MicroSaver lock sales being ever disclosed, in any form whatsoever. **SUF ¶35**. This failure to disclose can not be "cured" through subsequent patent office proceedings.

The '989 patent was subsequently reexamined from February 4, 1997 to April 14, 1998. Again, the April 1992 MicroSaver lock sales were not disclosed during that first reexamination. **SUF ¶36**. Thus, inequitable conduct occurred both during the original prosecution and again during the first reexamination.

The '989 patent was reexamined a second time during the period of September 24, 2004 to May 1, 2007. **SUF ¶37**. In an apparent attempt to "cure" the prior failures to disclose, ACCO at last, in this second reexamination, submitted, in September 2005, a Kensington MicroSaver computer lock box and literature (3 pages). The box and packaging literature contained <u>nothing</u> to reveal that any lock was ever sold, nor the date of such first sale. **SUF ¶38**. The box literature bore the copyright symbol "©" with a 2001 copyright date – clearly inadequate to inform the Examiner that the box (or any lock therein) were "published" as early as April 1992. **SUF ¶39**. Realizing, apparently, that disclosure of that 2001 vintage lock box will never pass as a "disclosure" of the actual lock sales in April 1992, ACCO submitted the box literature again, three months later in December 2005. This time, the box literature bore a February 1992 copyright date. **SUF ¶38**.

Neither disclosure provided information or informed the Examiner as to when any public sale of an included product might have commenced. A copyright notice date designates the "creation" of the document, not the date of its "publication." The box literature could not and

did not inform the Examiner that the described lock was actually placed on sale. The box literature did not describe or disclose a 3 x 7 mm slot size. The (undisclosed) physical locks would have revealed the slot size, but were never provided. In fact, the February 1992 "copyright date" is prior to the April 1992 "first sale" date, underscoring its irrelevance. Moreover, ACCO submitted this document without informing the Examiner when the product was "on sale," in a manner which minimized the risk of possible rejection of its patent applications, while providing it with a convenient (fig leaf) excuse that it did disclose the prior sales. Not surprisingly, ACCO buried the box literature among hundreds of other references provided to the Examiner, and submitted it more than a decade after the initial CIP filing in October 1993. Actually, on April 1, 2004, ACCO received a warning that it must disclose those sales, and made a decision to ignore it. **SUF ¶39.**

Regardless, under the Patent Law, the failures to disclose the sales during the original application proceedings and then again during the first reexamination of the '989 patent are dispositive. Inequitable conduct cannot be "cured" in subsequent reexamination or reissue proceedings.

### iii. The '403 Patent Application proceedings

Similarly, in the '403 patent, ACCO provided the same MicroSaver packaging and literature, with the 2001 and February 1992 copyright dates, in September and December of 2005, respectively. And here, the box literature was submitted after a Notice of Allowance had already been issued, and almost two years after the application for the '403 patent was filed on May 4, 2004. Here too, the box literature was buried among hundreds of other documents, which ACCO requested to be made "of record." As with all its information submissions, ACCO cautioned the Examiner that its submissions may not be prior art. **SUF ¶40.**

### iv. The '479 Patent Application proceedings

The application for this patent was filed March 13, 2001. **SUF ¶41.** ACCO waited close to five years, until September and December 2005 to submit the same Kensington MicroSaver packaging and literature mentioned above. ACCO should have simply informed the Examiner shortly after the filing date in 2001, that the MicroSaver lock has been on sale since April 1992. But it opted not to do so. **SUF ¶41.**

### v. The '125 Patent Application proceedings

The application for the '125 patent was filed November 12, 1999. **SUF ¶42.** In this application, ACCO delayed a full six years before it submitted, in September 2005, the

MicroSaver packaging, bearing the 2001 copyright notice date. **SUF ¶42**. In this patent prosecution file, ACCO <u>never did submit</u> the MicroSaver box and literature which had the 1992 copyright notice date. **SUF ¶42**. Also, the '125 patent claims recite a "retractable inhibiting member," interpreted to be an inhibiting member that is "retractable relative to the slot engagement member." The drawings and the written description of the original January 1992 '964 Application do not show such a "retractable inhibiting member." **SUF ¶42**. Therefore, the CIP date for many, if not all of the claims in the '125 patent is October 1993. **SUF ¶42**.

In summary, the materially important information about the sale of the MicroSaver product in April 1992 was never disclosed in the '634 Application. It was never disclosed in the original and first reexamination of the '989 patent. In the '125 patent file, the box literature bearing the February 1992 copyright date was never submitted. The box literature was submitted in the '403 patent prosecution after receipt of a Notice of Allowance. In the '479 patent, as well, the 1992 copyrighted box was submitted many years after the March 13, 2001 filing date thereof. **SUF ¶44**.

> ### D. The prosecution histories establish the materiality of the MicroSaver lock sales in April 1992

On several occasions the Examiner attempted to apply against the CIP applications, the disclosure in the '685 patent (even though the '685 patent issued on January 17, 1995), pursuant to 35 U.S.C. §102(e) or 35 U.S.C. §102(g). **SUF ¶43**. The prosecution history establishes that the Examiners believed that the original disclosure filed January 24, 1992, if applied against the later CIP applications, would render patent claims in the later applications either anticipated or obvious (when combined with other references). Therefore, contents of the scope of the '685 patent constitute <u>material</u> prior art. The physical locks delivered to customers in April 1992 disclosed more than the box and literature with which the locks were shipped. The physical locks disclosed the 3 x 7 mm dimension, whereas the box literature showed the slot, but did not disclose it dimension.

The April 1992 sale of ACCO's MicroSaver lock, which embodies the lock disclosed in the '685 patent, is thus, material prior art relative to every CIP patent claim which is not entitled to the January 24, 1992 "invention" date. Regardless of the erroneous belief of ACCO's patent counsel and the Examiner that the '685 patent is not citable as prior art under 35 U.S.C. §102(e), there was an absolute obligation to disclose <u>the sale</u> of the product in April 1992, which is prior art under 35 U.S.C. §102(a) or 102(b), pursuant to §103.

Instead of informing the patent examiners straightforwardly and candidly that it sold a product described in the original application in April 1992, which was designed to fit a 3 x 7 mm security slot, ACCO provided a copy of a lock package, bearing a 1992 "copyright" date. That did not disclose when the product was placed "on sale," nor the 3 x 7 mm slot dimension. Moreover, the disclosure was always late in the patent examination proceedings, after receipt of a "Notice of Allowance" in the '403 patent file. In addition, ACCO buried the lock literature document among more than two hundred other documents, to establish an "alibi" for the failure to disclose the full import of the actual sales. To lead the Examiner off the "scent," ACCO cautioned the patent Examiners not to assume that its submissions constitute "prior art."

ACCO had an absolute duty, but failed to inform the Examiner that as of April 1992, the lock shown in Figures 2 and 11-13B of its patents and sized to closely fit a security slot shown in Figures 5, 7 and 9 thereof, was on sale. A one-page statement would have sufficed. Effectively, ACCO engaged in clever concealing, rather than in honest, good faith informing and apprising the Examiners of the material facts.

In the patent field, an applicant's failure to disclose its own prior sales (particularly those preceding a patent filing by more than one year) is the most striking example of a failure to comply with the obligations to disclose material information. The totality of the circumstances reveals a calculated effort to conceal material information.

### 4. **The PCT '295 document was material prior art**

On August 5, 1993, the PCT Office of the World Trade Organization published the PCT '295 document, which publicly disclosed, for the first time, the entire contents of the original January 24, 1992 '964 Application, about eighteen months prior to the issuance of the corresponding U.S. patent (the '685 patent) on January 17, 1995. **SUF ¶45**. Although ACCO misstated to the Examiner that CIP applications are entitled to the invention date of their parent case and that, therefore, 35 U.S.C. §102(e) is inapplicable to ACCO's patent prosecution, that argument was not applicable to the PCT '295 document, which was prior art under 35 U.S.C. §102(a)/103 (relative to the '989, '479, and '125 patents), and additionally under §102(b) relative to the '403 patent. ACCO had an absolute obligation to timely disclose that document during the prosecutions of all of its CIP applications.

But the PCT '295 document was not disclosed during the prosecution of the patent application, which ultimately issued as the '989 patent on April 2, 1996. **SUF ¶45**. It was not disclosed during the subsequent first reexamination of the '989 patent (February 4, 1997 to April

14, 1998). It was eventually disclosed during the second reexamination of the '989 patent (September 24, 2004 to May 1, 2007), in late 2005. **SUF ¶45.**

In the same vein, the PCT '295 document was never disclosed in the prosecution of the '634 Application. The '989, '479 and '125 patents, claiming priority through it, are therefore effectively tainted by inequitable conduct, and should be held unenforceable.

5. <u>**ACCO failed to disclose material admissions and inconsistent prior litigation statements concerning inventorship**</u>

A. <u>The complex web of interrelated applications made the issue of inventorship important</u>

ACCO prosecuted a complex web of at least twenty-five interrelated applications, which produced at least twenty patents, as listed in the annexed tables, claiming priority via each other, pursuant to 35 U.S.C. §120. **SUF ¶46.**

Thus, the '403 patent claims priority to five prior applications, tracing back to January 24, 1992. In the applications table, under the heading "Family Chain," the lineage of the '403 patent is shown. It traces back first to the application identified in the table as "item 17," which is application serial number 08/998,961, filed December 29, 1997 (and which ultimately issued as U.S. patent number 6,735,990). The next in the application chain is referenced as item 12, namely application serial number 08/485,518 ("'518 Application"), filed on June 7, 1995. That application did not produce an issued patent. The chain then continues through the application identified as items 5, 4, 1. **SUF ¶47.**

The '634 Application (item 7) is the first in the series to show embodiments where a "pin" is inserted into the security slot <u>after</u> the locking member (T-bar) has been moved to the locked position. That application introduces Figures 14-27, and ultimately resulted in U.S. patent number 6,000,251. As mentioned (repeatedly) above, each of the '989, '125 and '479 patents is anchored in the '634 Application. The application chain for the '403 patent does not include the '634 Application and introduces Figures 14-27 for the first time on June 7, 1995, through the '518 Application (item 12, in the Application Table). **SUF ¶48.**

From the perspective of 35 U.S.C. §120, any patent claim which relies on the disclosure first introduced either on October 15, 1993 (relative to the '989, '125 and '475 patents) or June 7, 1995 relative to the '403 patent has an "invention date" of the CIP patent application.

B. <u>The importance of inventorship under 35 U.S.C. §102(e)</u>

35 U.S.C. §102(e) contains an exception to the normal requirement that prior art must have been <u>known publicly</u>, prior to the "invention date" of a particular patent claim. Under

§102(e), a U.S. patent which issues later than the filing date of a CIP application, can be used as prior art against that CIP patent application if, and only if, the "inventorship" in the two applications is not identical.

Using §102(e) of the Patent Act, the Examiners attempted to apply the original January 24, 1992 disclosure (in the form of its issued 5,381,685 patent) against several of the CIP patent applications. **SUF ¶49**. ACCO's patent counsel resisted, asserting (erroneously) that the CIP applications are entitled to the application date of the original application. Although NSI disagrees with the correctness of that assertion, the Examiner unwittingly agreed and removed the application of prior art under §102(e) on the basis of ACCO's assertion. Regardless, "inventorship" is always important and was discussed with the Examiner on several occasions, including in relation to a possible interference or conflict between the applications which resulted in U.S. patent number 5,327,752, which lists Gary Myers as an inventor. **SUF ¶50**. Inventorship is sufficiently important that, in the '403 patent file, ACCO cancelled one of the allowed claims to avoid having to name Gary Myers as an inventor. **SUF ¶51**. Therefore, prior testimony regarding inventorship (whether true or not) was "material" to the examinations of ACCO's numerous, interrelated and co-pending applications.

In the issued patents table, the first four patents include design patents Des. 346,733 and Des. 747,987, and utility patents 5,327,752 and 5,381,685. **SUF ¶52**. None of the first four patents names William Murray as an "inventor," despite the fact that ACCO's MicroSaver product is fully described in the two utility patents and depicted in one of the design patents. **SUF ¶53**. Mr. Murray was not listed as an inventor in the first six applications filed by ACCO. Information regarding "inventorship" is also materially important, because under 35 U.S.C. §102(f), only an inventor may apply for a patent.

C. Prior testimony contradicts material statements made in the Patent Office

On a plane flight, in early 1991, William Murray had the idea to develop a "security standard" that everyone would put in their products and then ACCO/Kensington would have a lock that locked to that standard. **SUF ¶54**. Murray then hired Stewart Carl Engineering ("SCE") to explore designs for the lock and a slot therefor. **SUF ¶54**. The idea he first disclosed to Stewart Carl of SCE was of a round hole using a "molly bolt design." **SUF ¶54**. In the twenty patents that have issued, Stewart Carl and an employee of SCE, Arthur Zarnowitz, are consistently listed as the inventors. Mr. Murray is not listed as an inventor on the first four patents. Murray stated that he is comfortable that he is not an inventor on the '685 patent.

**SUF ¶55**. The issue of inventorship was carefully scrutinized by ACCO's counsel, George Schwab and Michael Woods. **SUF ¶55**. Mr. Murray was first named as an inventor on the '634 Application, filed October 15, 1993, during a period when a dispute concerning ownership of patents arose with SCE.

Murray admitted that the idea of a rectangular slot came from Stewart Carl and he only approved it. **SUF ¶56**. Mr. Murray was not named as an inventor on the '685 patent even though its claims include and recite a cable. **SUF ¶56**. Murray admitted that he had a discussion with Stewart Carl and Arthur Zarnowitz about "inventorship." He admitted that Stewart Carl questioned why he [Murray] was on a patent. **SUF ¶56**. He admitted that the idea of a T-bar and the idea of pins came from Stewart Carl and Arthur Zarnowitz. **SUF ¶56**.

Stewart Carl testified under oath that ACCO requested his company to develop a second generation computer physical security device in a meeting with Murray, **SUF ¶57**. Mr. Carl did not recall any documents provided by Mr. Murray and stated that the whole idea of "universal security" was "kind of loaded but it was nebulous." **SUF ¶57**. The specifications Carl received for the universal physical security device for portable computers was that it be compatible with smaller computing devices like laptops and otherwise he got no guidance from Mr. Murray at the outset of the project. He did not recall any design concepts emanating from Mr. Murray. Mr. Carl could not identify anything in Figures 4, 12 or 14 of the '685 patent contributed by Mr. Murray. **SUF ¶57**. Mr. Carl could not identify any inventive contribution by Murray relative to claim 1 of the '989 patent. **SUF ¶57**. Mr. Zarnowitz testified to the same effect. **SUF ¶57**.

In the Belkin trial, Mr. Murray testified concerning the invention of the security slot. He referred to his notebook which only mentions a 2.5 x 6 mm security slot (which Dr. Dornfeld would not consider within the definition of about "3 x 7"). Mr. Murray testified that the final dimension of 3 x 7 mm for the slot was selected by the customer. **SUF ¶58**.

Thus, Murray's testimony during the Belkin trial that a customer contributed to the selection of the final 3 x 7 mm measurement is of crucial importance. None of the foregoing was ever disclosed.

6. **ACCO breached its duty to disclose litigation information**

The MPEP §2001.06 dictates could not be clearer. Patent applicants are obligated to disclose the existence and material contents of litigation, specifically any admissions or inconsistent statements relative to what has been stated or argued in the patent prosecution proceeding. ACCO has aggressively pursued litigation since 1996, which has continued

uninterrupted to this very date. It filed over two dozen lawsuits. **SUF ¶59**. The obligation of candor and good faith is meant to inform Examiners timely of such information. None of these litigations were adequately disclosed, and the single disclosure of litigation was perfunctory and indirect, as reflected by the disclosure of a Federal Circuit decision on an issue of infringement which was not relevant in the Patent Office. **SUF ¶60**.

In this action, ACCO's patent attorney Jewik's declaration (of September 19, 2008) states: "I believed that Belkin would have submitted its prior art in those reexamination requests and that Belkin had the opportunity to cite any relevant art to the PTO. Consequently, I did not review all of the litigation materials including every deposition and trial transcript. . . ." **SUF ¶61**. But Mr. Jewik admits: "the art cited by Belkin in the reexamination request did not include a Mac Portable." **SUF ¶61**.

The duty to disclose is applicable to ACCO, as a company, and ACCO was obligated to provide to Mr. Jewik the relevant materials and/or access to persons such as William Murray, Janet Ms. Dulsky, Dr. Dornfeld, etc. Ignoring PCG's explicit request to do so, Janet Dulsky opted to follow a "see nothing, hear nothing, know nothing" approach to the duty of candor and good faith owed the PTO. She forgot the testimony she heard at the Belkin trial. She did not consult with William Murray or Dr. Dornfeld.

Mr. Jewik's assertion to this Court that he believes that a patent Examiner would not find it useful (the Belkin trial transcript) "because it is unclear from the testimony whether the measurement discussed is in centimeters or millimeters" evidences Mr. Jewik's state of mind relative to the duty to disclose, which assumes that only bare documents need to be disclosed, rather than "material" information, such as the personal knowledge of Messrs. Murray, Dornfeld, etc. Actually, the obligation is to disclose information and knowledge, not only documents. Yet Mr. Jewik states that the trial transcript is "confusing," and he implicitly admits to this Court that he would have done nothing to clarify to the Examiners that the prior art Mac Portable computer referenced in the Belkin court proceeding had, in fact, a 3.3 x 8.3 mm security slot, and that the reference to "centimeters" was erroneous.

The first ever competitor to be sued by ACCO was Byte Brothers. Counsel for Byte Brothers, Michael Folice, wrote in July 2005 to ACCO's counsel, informing them that the invention of the '989 patent was "reduced to practice," meaning that it was actually built and publicly disclosed prior to the application date for the '989 original CIP application filed October 15, 1993. **SUF ¶62**. ACCO had an absolute obligation to disclose that letter in all of its CIP

patent applications, beginning on October 15, 1993. It never did disclose that letter. A "reasonable Examiner" would have deemed the information material because it would have given the Examiner the opportunity, for example, to contact Byte Brothers, to obtain the relevant "reduction to practice" information, which Byte Brothers (and NSI) believed would have resulted in a rejection of the claims of the '989 patent.

7. **Intent is easily inferred here from ACCO's overall conduct, particularly from the pervasiveness of the failures to disclose many items of material information in numerous patent applications**

PCG's prior briefing on the subject of inequitable conduct has already cited to the Court an extensive body of legal precedent establishing that an intent to deceive the PTO need not be proven by direct evidence and that it can generally be inferred from the facts and circumstances surrounding the applicant's overall conduct. On several occasions, including at the Belkin trial, and then through letters sent to ACCO's counsel by Byte Brothers' counsel and later by PCG's counsel, ACCO was apprised of the existence of material information which needed to be disclosed. At a minimum, the letters themselves had to be disclosed. ACCO, literally, thumbed their nose at this materially important information.

As noted above, material information of many different types was not disclosed in numerous patent applications. Instead of disclosing the existence of litigation, ACCO disclosed, in over a decade of intensive and extensive litigation, one irrelevant Federal Circuit decision. They did not disclose the prior sales of the MicroSaver products over the course of more than a decade. Becoming more concerned about the possible consequences of such non-disclosure, they furtively submitted a lock box with literature bearing a 2001 copyright date, and then submitted the same information with an impossible-to-notice, impossible-to-find, nearly illegible copyright notice dated February 1992, which the Examiners surely did not note given the hundreds of other patent documents and other literature which ACCO dumped on the Patent Examiners. The evidence in light of the totality of the circumstances is so one-sided that the factual issue of intent can and should be decided as a matter of law.

## IV.   CONCLUSION

Accordingly, NSI requests that summary judgment be granted in its favor holding each and every one of the '989, '403, '479 and '125 patents unenforceable for inequitable conduct that has occurred in the patent applications for those patents, and in the first, parent CIP '634 Application, filed October 15, 1993. At a minimum, the Court should find that NSI has

established that material information has not been disclosed, leaving only the issue of intent for a trial.

Respectfully submitted,

Dated: November 19, 2008            /s/ Max Moskowitz               .
                                    Max Moskowitz (Admitted *Pro Hac Vice*)
                                    Cameron S. Reuber
                                    Ostrolenk, Faber, Gerb & Soffen, LLP
                                    1180 Avenue of the Americas
                                    New York, NY 10036
                                    Phone: 212-382-0700

**Attorneys for Noble Security Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2008, I caused a true and correct copy of **MEMORANDUM IN SUPPORT OF NSI'S MOTION FOR SUMMARY JUDGEMENT OF UNENFORCABILITY FOR INEQUITABLE CONDUCT OF THE PATENTS IN SUIT AND/OR FOR PARTIAL FINDINGS OF FACT**, to be served on the following counsel via electronic mail:

Deanna L Keysor
Howrey LLP
321 North Clark Street
Suite 3400
Chicago, IL 60610
keysord@howrey.com

Daniel J. Vaccaro
Michael Best & Friedrich LLP
180 North Stetson Avenue
Suite 2000
Chicago, IL 60601
djvaccaro@michaelbest.com

**Attorneys for ACCO Brands USA, LLC**

Thomas D. Rosenwein
Gordon, Glickman, Flesch & Rosenwein
140 South Dearborn Street
Suite 404
Chicago, Illinois 60603
trosenwein@lawggf.com

Bradley P. Heisler
Heisler & Associates
3017 Douglas Boulevard
Suite 300
Roseville, California 95661
forinfo@heislerlaw.com

**Attorney for Defendant Cyberguys, Inc.**

Thomas J. Donovan
James E. Michel
Barnes & Thornburg
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
tdonovan@btlaw.com
jmichel@btlaw.com

John M. McCormack
Kolisch Hartwell, PC
260 Sheridan Avenue
Suite 200
Palo Alto, California 94306-2009
john@khpatent.com

Owen W. Dukelow
Michael R. Langer
Elizabeth Tedesco
T.J. Romano
Kolisch Hartwell, PC
200 Pacific Building
520 S.W. Yamhill Street
Portland, Oregon 97204
dukelow@khpatent.com
langer@khpatent.com
tedesco@khpatent.com
tromano@khpatent.com

**Attorneys for Defendant PC Guardian Anti-Theft Products, Inc.**

/s/ Cameron S. Reuber          .
Cameron S. Reuber
**Attorney for Noble Security Inc.**